# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ESTATE OF ROBERT LANCE HARRIS,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**ABBOTT ACQUISITION COMPANY, LLC,** )<br>**et. al.,** )<br>)<br>**Defendants.** ) | **C.A.No. 16-243 ERIE**<br><br>**Magistrate Judge Baxter** |

## MEMORANDUM OPINION

Magistrate Judge Susan Paradise Baxter[1]


## I.   Background

### A.   Introduction

This action arises out of the death of Robert Lance Harris ("Mr. Harris" or "Decedent"), a

member of a Pennsylvania limited liability company ("LLC") named Abbott Acquisitions

Company, LLC ("Abbott Acquisitions, LLC").   On September 20, 2016, Mrs. Tracey Harris, the

widow of Robert Harris ("Mrs. Harris" or "the widow"), filed the Complaint in the Court of

Common Pleas of Elk County, Pennsylvania, on behalf of the Estate of Robert Lance Harris

("the Estate") in her capacity as the personal representative of the Estate ("Plaintiff"), asserting

state law claims against Abbott Acquisitions, LLC and Mr. Edmund Gaffney ("Mr. Gaffney")

(collectively "Defendants").   On October 10, 2016, Defendants removed this matter to federal

court on the basis of diversity jurisdiction. (ECF No. 1 at ¶ 8).   The Notice of Removal contained

---

[1]   In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF No. 23).

averments that: Plaintiff is a citizen of Florida, (ECF No. 1 at ¶ 3); Mr. Gaffney is a citizen of Pennsylvania, (ECF No. 1 at ¶ 4); Mr. Gaffney had not yet been served with the Complaint, (ECF No. 1 at ¶ 2), and Abbott Acquisition, LLC "does not admit that process was properly served on it, and fully reserves all rights to challenge and/or object on the grounds of improper service of process," (ECF No. 1 n.1), but not anywhere within averring the citizenship of Abbott Acquisition, LLC. See Lincoln Ben. Life Co. v. AEI Life, LLC, 800 F.3d 99, 108 (3d Cir. 2015)("Of course, where the unincorporated association is the proponent of diversity jurisdiction, there is no reason to excuse it of its obligation to plead the citizenship of each of its members."). On October 17, 2016, Defendants filed an Amended Notice of Removal, (ECF No. 4), this time making averments in the body of the amended notice that Abbott Acquisition, LLC at the time of removal had only one member, Mr. Gaffney, who is a citizen of Pennsylvania (ECF No. 4 at ¶ 6), and that because Mr. Gaffney had not been served, Abbott Acquisition, LLC as a result also had not been served with process. (ECF No. 4 at ¶ 9).

On October 26, 2016, Plaintiff filed its motion to remand the matter pursuant to 28 U.S.C. § 1447(c) for a defect in removal, namely the removal to this Court from a Pennsylvania court by Pennsylvania forum defendants, and for lack of subject matter jurisdiction, as the Complaint contains no federal law claims and Plaintiff contends that complete diversity is lacking. Plaintiff also filed a brief in support of remand. (ECF No. 9). Defendants filed their brief in opposition to remand on November 14, 2016, (ECF No. 11), Plaintiff filed its reply in further support of remand on November 20, 2016, (ECF No. 12), and Defendants filed a sur-reply in opposition to remand with leave. (ECF Nos. 13, 15, 19). On December 2, 2016, Defendants filed a motion to dismiss, (ECF Nos. 16), which the Court stayed on request of Plaintiff pending resolution of the motion to remand. (ECF Nos. 20, 21). The Court also has

received documentary evidence submitted by the parties attached to the Notice of Removal, Complaint, and briefs.  (ECF Nos. 1-1, 8-2, 8-3, 11-1, 11-2, 12-1).  After careful consideration of the parties' submissions, and for the following reasons, Plaintiff's Motion to Remand [ECF No. 8] will be granted.

### B.     Facts[2]

Abbott Acquisition, LLC was formed on October 20, 2014.  (ECF No. 1-1, Complaint at ¶ 5).  On December 1, 2014, Mr. Harris, a citizen of Florida, and Mr. Gaffney, a citizen of Pennsylvania, entered into the "Limited Liability Company Operating Agreement of Abbott Acquisition Company, LLC," ("Operating Agreement")[3] establishing Abbott Acquisitions, LLC, as a two member Pennsylvania limited liability company with Mr. Harris and Mr. Gaffney each owning as member 50% of the company.  (ECF No. 1-1, Complaint at ¶ 6).

Abbott Acquisitions, LLC was formed under Pennsylvania's Limited Liability Company Law of 1994 (also "LLC Act"), 15 Pa. Cons. Stat. § 8901 et seq.,[4] which was modeled after the Prototype Limited Liability Company Act, see 1994 Committee Comment and Source Note to 15 Pa. Cons. Stat. § 8901, and which was in effect at the time of Abbott Acquisition, LLC's organization but subsequently amended.  Effective February 21, 2017, Pennsylvania's LLC Act was repealed and replaced by the Pennsylvania Uniform Limited Liability Company Act of 2016 ("new LLC Act"), 15 Pa. Cons. Stat. § 8811, et. seq., which is modeled, in part, after the Uniform Limited Liability Company Act (2006).  Section 8811, 15 Pa. Cons. Stat., of

---

[2] The Court is permitted to go beyond the Complaint due to the nature of the motion.  Harris v. Kellogg Brown & Root Servs., Inc., 724 F.3d 458, 464 (3d Cir. 2013).

[3] Both parties refer to the Operating Agreement, (ECF Nos. 1-1 at 11-23; 9 at 2; 11 at 6), which is attached to and incorporated into the Complaint.  The Court appropriately considers its relevant provisions in the context of the jurisdictional issues raised by the parties' filings.

[4] The prior effective LLC Act was modeled after the Prototype Limited Liability Company Act.  See 1994 Committee Comment and Source Note to 15 Pa. Cons. Stat. § 8901.

Pennsylvania's new LLC Act provides that prior to April 1, 2017 the new act governs LLCs formed on or after February 21, 2017, and an LLC formed prior to February 21, 2017 that elects to be subject to it. 15 Pa. Cons. Stat. § 8811(b). It also provides that on and after April 1, 2017, the new act governs all LLCs. 15 Pa. Cons. Stat. § 8811(c).[5]

The Operating Agreement executed by Mr. Harris and Mr. Gaffney provides in relevant part:

## SECTION 4
## TERM; FISCAL YEAR

The Company shall continue until terminated pursuant to Section 11 of this Agreement or as otherwise required to be terminated pursuant to the Act. . . .

## SECTION 5
## MEMBERS' CAPITAL ACCOUNTS AND INTERESTS

****

5.3    **Admission of Members.**  In the event any additional Members are admitted to the Company, the Interests in the Company of the most recently admitted Member shall be as specified at the time such new Member(s) shall be admitted and the Interests in the Company of all other Members of Company shall be proportionately reduced.  *The foregoing shall not apply to any substituted Member who is the transferee of an Interest*.

****

## SECTION 8
## MANAGEMENT OF THE COMPANY

8.1    **General Management.**  Management and control of the operations of the Company and all decisions with respect to the Company's affairs shall rest exclusively with the Members. . . *If any Interests are transferred, the transferee shall become a Member with a voting Interest in the Company to the extent of the Interests so transferred*.

****

---

[5]The Court is presently concerned with its jurisdiction and the remand motion and therefore, expresses no opinion on the impact of the new LLC Act as of April 2, 2017 on resolution of the merits.

**8.4     Standard of Care of Members.** The Members shall have a fiduciary responsibility for the safekeeping and use of all cash and property of the company.  The Members shall not employ such cash or property in any manner except as permitted under this Agreement and the Act.  *The Members shall carry out their duties and exercise their powers hereunder in good faith and in a manner reasonably believed by the Members to be in the best interests of the Company and its Members.  No Member shall be liable* to the Company or any Member for any matter or item, *unless such matter or item is attributable to gross negligence, willful misconduct or fraud on the part of such Member*.  The Members may consult with legal counsel or accountants selected by them, and no Member shall be liable to the Company or a Member for any act or omission suffered or taken by such Member in accordance with the opinion or advice of such counsel or accountants.

****

**SECTION 11**
**TRANSFERABILITY OF INTERESTS**

**11.1     General Restriction on Transfers.**   Except as and to the extent expressly permitted in this Section 11, each Member agrees that, *during such Member's lifetime or upon or after his or her death, such Member or his or her personal representative will not transfer*, sell, convey, assign, dispose, distribute, encumber, pledge, mortgage, hypothecate or gift ("Transfer") *all or any portion of such Member's Interest in the Company*, which such Member now owns or may hereafter acquire, except that a Member may Transfer all or any portion of his or her Interest in the Company to any other Member upon written notice given to the other Members on or before the effective date of the Transfer.

**11.2     Life Insurance.**   As soon as practicable after closing, *the Company shall maintain life insurance policies on each of the Members in an amount agreed upon by the Members.  Each Member hereby agrees to cooperate fully* by performing all the requirements of the life insurer which are necessary conditions precedent to the issuance of life insurance policies.

**11.3     Death of a Member.**   *In the event of the death of a Member, the deceased Member's personal representative* or the trustee ("Trustee") of any trust for the deceased Member which is included in the deceased Members' gross estate for Federal estate tax purposes *shall be deemed to have offered to sell to the Company, and the Company shall be required to purchase from such personal representative or Trustee, all and not less than all of the deceased Member's Interest in the Company.  The purchase price* for such Interest in the Company **shall be the greater of**:  (i) *the proceeds from the life insurance policy of such Member, or* (ii) *the Equity Value of such Interest* which shall be calculated in accordance with the following formula:  Equity Value shall equal:  (A) (i) Member's Percentage Interest, times (ii) the EBITDA of the Company for the most recent trailing twelve month period immediately prior to the date of death of the Member, times (iii) 3.0, minus (B) all outstanding indebtedness of the Company as of the date of death of the Member.

**11.4    Violation.**  _Any purported or attempted Transfer of an Interest in the Company that is not in compliance with this Agreement shall be null and void._

**\*\*\*\***

## SECTION 14
## MISCELLANEOUS

**\*\*\*\***

**14.2    Governing Law.**  This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without regard to conflicts of laws principles.

**\*\*\*\***

**14.5    Successors and Assigns.**  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective administrators, executors, legal representatives, heirs, successors, and assigns.

**\*\*\*\***

(ECF No. 1-1 at 11) (emphasis added).

Operating Agreement § 11.2 provides that Abbott Acquisitions, LLC, would maintain life insurance policies on both of its members "in an amount agreed upon by the Members" and required the Members to cooperate in obtaining the policies.   According to the Complaint and as expressly contemplated by § 11.2, Mr. Harris and Mr. Gaffney agreed to the purchase by Abbott Acquisitions, LLC, of "key man" life insurance policies insuring against their death in the amount of $5,000,000.00 each.  (ECF No. 1-1, Complaint at ¶ 9)**.**  Abbott Acquisitions, LLC, however, only purchased such a policy in the amount of $5,000,000.00 insuring the life of Mr. Gaffney, but did not purchase a similar life insurance policy regarding Mr. Harris.  (ECF No. 1-1, Complaint at ¶ 10).

Mr. Harris, who was a citizen of Florida, died on July 2, 2016.  (ECF No. 1-1, Complaint at ¶ 11).   Abbott Acquisitions, LLC and Mr. Gaffney thereafter demanded that Mr. Harris' member interest in the LLC be sold to Abbott Acquisitions, LLC pursuant to Operating Agreement § 11.3.   (ECF No. 1-1, Complaint at ¶ 11).

Subsequently, on August 1, 2016, letters of administration were issued to Tracey D. Harris solely in her capacity as duly authorized Personal Representative of the Estate of Robert Lance Harris by the Circuit Court of the 18th Judicial Circuit in and for Seminole County, Florida. (ECF No. 8-3). Plaintiff, the personal representative of the Estate, through correspondence dated August 3, 2016, just two days after the letters of administration issued, specifically indicated to Mr. Gaffney and Abbott Acquisition, LLC that based on Abbott Acquisition, LLC's failure to maintain key man life insurance on Mr. Harris as required by Operating Agreement § 11.2, and other unspecified material breaches of the Operating Agreement, § 11.3 was not operative and any "deemed" sale by the Estate to Abbott Acquisitions, LLC could not be rightfully demanded under § 11.3. (ECF No. 1-1, Complaint at ¶ 12; 12-1).

Correspondence on August 12, 2016 and August 30, 2016 from Unum Life Insurance Company of America, Group Life/Special Risk Benefits, to Tracey Harris, widow, and copied to Abbott Furnace Company, Inc. ("Abbott Furnace, Inc."),[6] indicated that the widow as beneficiary of an employee Group Life Insurance policy with Abbott Furnace, Inc., for whom Mr. Harris apparently worked, would receive payment of the $20,000.00 Group Life Insurance benefits by check to her. (ECF No. 11-2 at 17, 19). It appears that Abbott Furnace, Inc., as opposed to Abbott Acquisitions, LLC, additionally made two wire transfers totaling $20,000.00 into the account of the widow (as opposed to the account of the Estate of Robert L. Harris or to Tracey Harris Personal Representative of the Estate of Robert L. Harris): one dated July 25, 2016 for $6,500.00, prior to issuance of any letters of administration to Tracey Harris to act as

---

[6] According to the Affidavit of Mr. Gaffney, Abbott Acquisitions, LLC is the owner of Abbott Furnace, Inc. (ECF No. 11-1 , ¶ 2).

personal representative of the Estate; and one dated September 8, 2916 for $13,500.00. (ECF No. 11-2 at 22).

By correspondence dated September 7, 2016, Defendants' counsel indicated to Plaintiff's counsel that payment was being made *via* wire that date to the Estate of Mr. Harris care of Tracey Harris in the amount $13,500.00 and that the amount of $6,500.00 had previously been paid to Mrs. Harris and that together those payments comprised "the full amount due and owing in consideration of the purchase of all of Mr. Harris's [sic] Interest in Abbott pursuant to Section 11.3 of the Operating Agreement." (ECF No. 11-2 at 24). There is nothing in the record, however, to suggest that the wire transfer actually was made to the account of the Estate or that Plaintiff ever had given the Estate's bank account or wire information such that these wired payments to the widow were actually any payments to the Estate as contemplated by § 11.3 of the Operating Agreement. Indeed, the letters of administration had not even issued to Plaintiff until after the first wire transfer was made. Additionally, the correspondence unilaterally attempts, but may not have done so successfully in light of the present dispute, to cast as a *fait accompli* a deemed sale, stating that:

> [t]he amount of $20,000[7] (which is the sum total of the proceeds of the life insurance policy of Mr. Harris) is the amount of the purchase price for the Interest of Mr. Harris as dictated by Section 11.3 of the Operating agreement, and today's payment executes and completes Abbott's purchase of Mr. Harris' Interest in Abbott.

(ECF No. 11-2 at 24). The Court recognizes that it is Defendant Abbott Acquisitions, LLC, of which Mr. Harris was a member, and not Abbott Furnace, Inc. or some other unspecified Abbott entity, that the Operating Agreement dictates as the entity to make the purchase and ultimately

---

[7] The Court notes that according to Plaintiff, Ms. Harris indicated to Defendants through respective counsel that she intended to treat the $6,500.00 payment and the $13,500.00 payment wired into her account from Abbott Furnace, Inc. (again not Abbott Acquisitions, LLC) as the unpaid wages due and owing to her husband for work performed by him for Abbott Furnace, Inc. prior to his death. (ECF No. 12 at 4).

required payment, if any, necessary to complete the transaction under § 11.3, assuming the requirements § 11.4 did not operate to render any transfer null and void.

In sum, the record of payments provided by Defendants shows payment to the widow and not to the Estate or Tracey Harris in her capacity as Personal Representative of the Estate; shows payment from Abbott Furnace, Inc. and not from Abbott Acquisitions LLC; and shows that $20,000.00 was an amount of benefits payable from a <u>group insurance policy</u> from Abbott Furnace, Inc. insuring the life of Mr. Harris with the widow as beneficiary not an amount of a key man policy owned by Abbott Acquisitions, LLC. Thus, the payments by wire transfer on the present record do not appear on the Court's initial review to meet the requirements of Operating Agreement §§ 11.2 and 11.3, leaving Mr. Harris' Membership interest and the nature of that interest remaining in play for jurisdictional purposes.[8]

## II.     <u>Standard</u>

### A.     **Removal and Remand**

Pursuant to 28 U.S.C. § 1332(a),

> [a] civil action brought in state court may be removed by the defendant to federal district court if the federal court would have had original jurisdiction over the claim. 28 U.S.C. § 1441(a). Diversity of citizenship subject matter jurisdiction falls within the original jurisdiction of the district court, pursuant to § 1332(a) of Title 28 of the United States Code.

<u>Johnson v. SmithKline Beecham Corp.</u>, 724 F.3d 337, 346 (3d Cir. 2013)(internal citations and quotations omitted). The removal statute specifically provides:

### § 1441. Removal of civil actions

---

[8] That "Abbott" then and now seeks to recast the group life insurance payout due to the widow from a $20,000.00 group policy insuring the life of her husband for her benefit as the key man policy required by the Operating Agreement seems a bit of a stretch and does not establish without doubt that the purchase contemplated in § 11.3 ever was fully consummated.

**(a) Generally.**--Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

**(b) Removal based on diversity of citizenship.--(1)** In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.

**(2)** A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title <u>may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought</u>.

28 U.S.C. § 1441 (emphasis added).

Remand of a removed case is governed by 28 U.S.C. § 1447, which provides in part:

**(c)** A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

**(d)** An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

28 U.S.C. § 1447(c) & (d).

"Diversity jurisdiction is founded on assurance to non-resident litigants of courts free from susceptibility to potential local bias." <u>Guar. Trust Co. of N.Y. v. York</u>, 326 U.S. 99, 111, (1945); <u>McSparan v. Weist</u>, 402 F.3d 867, 876 (3d Cir. 1968). Diversity jurisdiction also requires "complete diversity" that is "no plaintiff can be a citizen of the same state as any of the

defendants." <u>Grand Union Supermarkets of the Virgin Islands, Inc. v. H.E. Lockhart Management, Inc.</u>, 316 F.3d 408, 410 (3d Cir. 2003). Complete diversity must exist both at the time the complaint is filed and, if removed, at the time of removal. <u>Johnson</u>, 724 F.3d at 346.

Defendants as the removing party bear the burden to establish federal jurisdiction. <u>Id.</u>; <u>Abels v. State Farm Fire & Cas. Co.</u>, 770 F.2d 26, 29 (3d Cir. 1985). Furthermore, any doubts in construing the removal statute are to be resolved in favor of remand. <u>Johnson</u>, 724 F.3d at 346.

> The usual rule is that removability is determined from the record before the court at the time the notice of removal (formerly the petition for removal) is filed in federal court. The district court's inquiry cannot be limited to the complaint, as it often can be when removal is based on federal question jurisdiction, because certain matters critical for determining diversity jurisdiction, such as the citizenship of the parties or the amount in controversy, may not appear in the state court complaint.

<u>Removal Based on Diversity of Citizenship and Alienage Jurisdiction</u>, 14B Fed. Prac. & Proc. Juris. § 3723 (4th ed.). Where a factual challenge to jurisdiction is asserted, the court may consider the Notice of Removal, the Complaint, attachment and matters outside of the pleadings. 16 James WM. Moore, Moore's Federal Practice § 107.151[1][e] (3d ed.). "[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." <u>Harris v. Kellogg Brown & Root Servs., Inc.</u>, 724 F.3d 458, 464 (3d Cir. 2013)(internal citations and quotations omitted).

## III. <u>Discussion</u>

Plaintiff contends that this matter should be remanded for lack of diversity jurisdiction and for a defect in the removal. Plaintiff has made a timely motion to remand: 1) for the asserted defect in removal, having filed the motion within 30 days after the filing of the notice of

removal; and 2) for lack of subject matter jurisdiction as that motion may be made at any time. 28 U.S.C. § 1447(c). The Court first considers the matter of diversity jurisdiction.

### A. Consideration of Abbott Acquisition, LLC's Membership in Determining Whether Complete Diversity Existed at the Time of Filing and Removal

The parties do not dispute that Plaintiff is a citizen of Florida[9] and Defendant Gaffney is a citizen of Pennsylvania. Plaintiff, however, contends that Defendant Abbott Acquisitions, LLC is a citizen of both Pennsylvania and Florida because an LLC has the citizenship of every state of which its members are a citizen. Defendants assert in response that upon Mr. Harris' death the LLC became only a citizen of Pennsylvania, and therefore, diversity is complete.

In general, "[a] limited liability company (LLC) is a hybrid business entity that offers its members limited liability as if they were shareholders of a corporation, but treats the entity and its members as a partnership for tax purposes." 48 A.L.R.6th 1 (Originally published in 2009). The Court of Appeals for the Third Circuit follows the approach applied to partnerships when determining the citizenship of LLCs for diversity purposes. As explained in <u>Johnson</u>:

> this and every other Circuit Court to face the question have held that the citizenship of a limited liability company "is determined by the citizenship of each of its members." *Zambelli Fireworks Mfg. Co. v. Wood,* 592 F.3d 412, 418 (3d Cir.2010); *see also id.* at 420 (collecting cases from our sister circuits). In *Zambelli,* we noted that limited liability companies "resemble corporations in many respects," but we recognized that the Supreme Court has "flatly rejected arguments in favor of extending the rule of corporate citizenship to analogously formed business entities." *Id.* at 419 (citing *Carden[v. Arkoma Assoc.],* 494 U.S.[185] at 189, 110 S.Ct. 1015 [1990]). Therefore, we opted to treat limited liability companies as we do partnerships and other "unincorporated associations," and held that courts must look to the citizenship of a limited liability company's members to determine if there is diversity jurisdiction.

---

[9] The legal representative of an estate of a decedent is considered to have the citizenship of the decedent, 28 U.S.C. § 1332(c)(2), which was Florida.

724 F.3d at 348. Thus, the citizenship of any member of Abbott Acquisitions, LLC at the time of filing and removal must be considered for diversity purposes.

Plaintiff specifically asserts there is no complete diversity here because "[Mr.] Harris, an Abbott [Acquisitions, LLC] member, was a resident of the State of Florida [and] Mr. Harris' membership interests . . . currently reside in the Harris Estate . . . in Florida. (ECF No. 12 at 7). Plaintiff's argument is premised on consideration of the nature of Mr. Harris' membership interest after his death on July 2, 2016. On the other hand, Defendants emphatically assert that once Mr. Harris died, Mr. Gaffney became the only member of Abbott Acquisitions, LLC, and Abbot Acquisitions, LLC only had Pennsylvania citizenship at that point, making diversity complete. Defendants rely on the $20,000.00 in payments by Abbott Furnace, Inc. to the widow in attempts to urge transfer of all of Mr. Harris' membership interests already had been accomplished by the time this action was filed and removed, rendering Abbott Acquisitions, LLC unquestionably solely a Pennsylvania citizen. (ECF Nos. 11 at 15).

Despite Defendants' attempts to ignore that the question presents and persists, (ECF No. 13-1 at 7), whether and to what extent Mr. Harris' membership and/or membership interests survived Mr. Harris' death is a crucial question to answer in order to determine the effect of any attempted transfer, the relevant citizenships at play, and ultimately, whether this Court has subject matter jurisdiction. Cf. Carbine v. Xalapa Farm Ltd. P'ship, 980 F. Supp. 860, 863 (E.D. La. 1997)("Despite plaintiff's contentions, therefore, it is necessary in this case to look at Kentucky law and to the actual Partnership Agreement in deciding whether the plaintiff and her brothers should properly be considered limited partners.").

### 1. Relevance of Pennsylvania Law Governing LLCs and the Operating Agreement

Regarding the merits, Plaintiff has relied on the structure of §§ 11.3 and 11.4 in that those sections do not provide for automatic vesting of all of a member's interests in Abbott Acquisitions LLC on the member's death and do not state that on the member's death that member's membership terminates.  (ECF No. 12 at 3).  Plaintiff thus posits regarding the jurisdictional matter that Mr. Harris' membership interests in the LLC reside in the Estate, resulting in Abbott Acquisitions, LLC also being a citizen of Florida.  (ECF No. 9 at 6).  Defendants contend that the "value of the <u>economic interest</u> that the Estate invokes is distinct from Abbott's membership itself," (ECF No. 11 at 6), so that there only is one relevant member of Abbott Acquisitions, LLC—Mr. Gaffney, the Pennsylvania citizen.    The effect of Mr. Harris' death necessarily implicates analysis and interpretation of the Operating Agreement under the prior effective LLC Act because: (1) Mr. Harris died prior to the effective date of Pennsylvania's new LLC Act; (2) this action was filed and removed prior to both of those dates; and (3) diversity jurisdiction is to be determined at the time the action was filed and removed in 2016.

Defendants as the removing party to this Court bear the burden of establishing diversity jurisdiction, yet provide nothing to address the impact of the timing of Mr. Harris' death *vis a vis* Pennsylvania's prior LLC Act or even the new LLC Act.  Indeed, neither party undertakes an analysis of Pennsylvania LLC law, not much is undertaken by either party in the way of analysis of the actual terms of the Operating Agreement, and still none is undertaken on law regarding the effect of the death of the member on LLC citizenship under similar circumstances.

Under Pennsylvania's LLC Act, a member is defined as "[a] person who has been admitted to membership in a limited liability company and who has not dissociated from the

company." 15 Pa. Cons. Stat. § 8903(a). The LLC Act also provides that "[t]he interest of a member in a limited liability company constitutes the personal estate of the member and may be transferred or assigned as provided in writing in the operating agreement." 15 Pa. Cons. Stat. § 8924(a). The member's interest in Pennsylvania includes economic, voting and management rights. 2001 Committee Comment to § 8924(a).

Some states' LLC laws expressly provide for <u>termination of a member's membership</u> in an LLC upon the death of that member, a result Defendants contend happened here. Louisiana law, for example, provides:

> A. Except as otherwise provided in the articles of organization or a written operating agreement, if a member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the member's membership ceases and the member's executor, administrator, guardian, conservator, or other legal representative shall be treated as an assignee of such member's interest in the limited liability company.

La. Stat. Ann. § 12:1333(A). Like the Louisiana law, Pennsylvania's new LLC Act specifies in § 8863(a)(1) that "[i]f a person dissociated as a member," that "person's rights as  a member terminate," and § 8861(7) provides for dissociation on death of an individual, thus effecting the same result as in the Louisiana law. Notably, however, Pennsylvania's LLC Act in effect at the time of filing and removal does not appear to have the same provision. Section 8971 of Pennsylvania's LLC Act does provide for dissolution of the LLC on the death of a member, "[e]xcept as otherwise provided in writing in the operating agreement," 15 Pa. Cons. Stat. § 8971(4), or on vote or consent of a majority in interest to continue operation of the business. 15 Pa. Cons. Stat. § 8971(4). Section 8971 notably does not specific or require <u>termination of a member's membership</u> on death, and both it and 15 Pa. Cons. Stat. § 8915 provide for

modification by the Operating Agreement. The Operating Agreement's provisions in §§ 11.2 and 11.3 appear to except Abbott Acquisitions, LLC from automatic dissolution as provided for by § 8971 and also appear to effect the membership and/or membership interests.[10]

Operating Agreement § 11.3 refers to prohibitions on a member's estate transferring upon the member's death "all of the member's interest." It does not refer to all of the interest that the Estate would possess on the death of the member, all of the economic interests of the Estate, or that the Estate only possesses the member's economic interests—but broadly all of the member's interest, which not only includes economic interests, but also voting and management rights. *See* 2001 Committee Comment to 15 Pa. Cons. Stat. § 8924(a); <u>see also</u> Operating Agreement § 8.1.

Section 11.4 renders null and void—not just voidable—any transfer not in compliance with the Operating Agreement, which includes the key man policy provisions in § 11.2, the death of a member provisions of § 11.3 and the standard of care of members provisions in § 8.4. If the Estate acceded to <u>all</u> of Mr. Harris' membership rights under the Operating Agreement and the LLC Act in effect and those membership rights were not otherwise extinguished or transferred at the time of filing and removal, it seems that the Court would lack jurisdiction over the matter regardless of any other defect in removal because the LLC also would be a citizen of Florida, notwithstanding Defendants' bald and conclusory position to the contrary. (ECF No. 11 at 6).

The court in <u>Tormey v. Morning Dove, LLC</u>, 2013 WL 1450513, at *2–3 (W.D. Okla. Apr. 9, 2013), faced this very jurisdictional quandary. Considering relevant state law and agreement provisions, the <u>Tormey</u> court explained:

> The existence of diversity jurisdiction is determined at the time the lawsuit is filed. The time-of-filing rule ... measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing—whether the challenge be brought shortly

---

[10] The new LLC Act like the prior law permits for alteration.

after filing, after the trial, or even for the first time on appeal. A review of the [relevant operating agreement] . . . reflects that the parties' interpretation is correct. The operating agreement addresses the impact of a death of one of its members, and defines the death of a member as an "event of dissociation." Operating agreement, Section 10.05. The agreement also prescribes a procedure whereby the remaining members may elect to purchase the deceased member's units within 30 days of notice of the member's death by negotiating with his legal representative. *Id.* If an agreement cannot be reached, then the remaining members have an option, to be exercised within 60 days after the event of dissociation, to purchase the deceased member's interest. The operating agreement further provides that "[f]rom and after the Event of Dissociation, the Dissociated Member shall be considered a creditor of the Company ... and all other statutory or contractual rights associated with the former Member's interest shall cease." Operating agreement, Section 10.05, p. 15.

The record reflects that Mr. Tormey died on December 24, 2011, and it is not disputed that Morning Dove was notified of his death on December 26, 2011. Defendants do not dispute that there was no purchase of his interest in Bridgewater under Section 10.05 of the operating agreement. Thus, under the clear terms of the operating agreement, Mr. Tormey was no longer a member of Bridgewater following his death, and his estate holds the status of a creditor of Bridgewater. The only remaining member of Bridgewater is Morning Dove, and Morning Dove is a citizen of Oklahoma for diversity purposes. As Mr. Tormey's personal representative, Plaintiff is deemed to be a citizen of Utah. Because Mr. Tormey was no longer a member of Bridgewater at the time this lawsuit was filed, his Utah citizenship would not be attributed to Bridgewater, and diversity of citizenship existed when this lawsuit was filed on November 29, 2012.  Having fully reviewed the parties' respective briefs, the Court concludes that . . .  at the time this action was filed, complete diversity of citizenship existed.

Id. (internal citations and quotations omitted).  Thus, in Tormey the operating agreement spelled out at death that the estate held the status of creditor, not member.

In Quincy V, LLC v. Herman, the Court of Appeals held that upon the death of the partner, the estate of the deceased partner was not considered a member of the real estate general partnership because under New York law the general partnership dissolved on the partner's death absent specific agreement to the contrary and the continued business of the partnership by the

surviving partners created a new partnership at will.  652 F.3d 116, 120 (1ˢᵗ Cir. 2011). The

estate in <u>Herman</u> disavowed any intent to become a partner, though it received payments as a

"sort of creditor" and not as a current partner.  <u>Id</u>. The court's jurisdictional conclusion was

grounded on the particular effect of the applicable state law.

The court in <u>United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp.</u>, 907 F. Supp. 663,

668-669 (S.D. N.Y. 1995), likewise considered whether the citizenship of the estate of a limited

partner who died prior to the action should be considered in determining diversity jurisdiction.

The court considered <u>both the partnership agreement and New York's partnership law</u> regarding

the rights and interests implicated, determining that a state law provision giving the estate the

"rights of a limited partner <u>for the purpose of settling [the] estate</u>" and the partnership agreement

requiring certain steps be taken for an assignee of partnership rights to become a limited partner

meant that the estate's citizenship was not considered for diversity purposes because the estate

was not a limited partner at the time the action was commenced.  <u>Id</u>. at 670-671.

Similarly, in <u>Queens Syndicate Co. v. Herman.</u>, 2010 WL 1222758 (D. Mass. Mar. 24,

2010), the court on a motion to remand for lack of complete diversity observed when considering

the governing state law:

> It is true that the citizenship of an unincorporated entity, such as a
> partnership, is determined by the citizenship of all of its members.
> *Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina,
> Inc.,* 435 F.3d 51, 54 (1ˢᵗ Cir.2006). *See also, Halleran v. Hoffman,* 966
> F.2d 45, 47 (1ˢᵗ Cir.1992).
>
> It is not true, however, that the estate of Stephen Cooperman automatically
> assumed Cooperman's status as a general partner of the plaintiff real estate
> partnerships upon his death. First, Minor has pointed to no provision in the
> documents governing the partnerships contemplating such a
> metamorphosis. Second, New York law does not give the estate of a
> general partner any such automatic general partner status. <u>See</u>, e.g.,
> <u>Birnbaum v. Birnbaum,</u> 157 A.D.2d 177, 186, 555 N.Y.S.2d 982
> (N.Y.App.Div.1990) ("the Surrogate properly rejected the estate's claim

that it is entitled to a general partnership interest" in the limited partnership).

> It is true that, for certain purposes, the estate of a deceased partner may be afforded "all the rights of a limited partner *for the purpose of settling his estate*" but in these circumstances the estate does not actually become a partner for jurisdictional purposes. <u>United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp.</u>, 907 F.Supp. 663, 669 (S.D.N.Y.1995) (interpreting N.Y. Partnership Law § 110(1)) (emphasis supplied). <u>See</u> <u>also</u> <u>Burstein v. Central Hudson Associates</u>, 244 A.D.2d 174, 665 N.Y.S.2d 262 (N.Y.A.D.1997).

<u>Id</u>. at *2.

The governing language in New York law "for the purpose of settling [the] estate," which played a part in the court's analysis in <u>Queens Syndicate</u> and <u>Waterfront</u>, is similar to the language employed in portions of Pennsylvania's new LLC Act, 25 Pa. Cons. Stat. § 8854 (addressing certain rights a deceased member's personal representative may exercise). Under the prior LLC Act, in effect at the time of filing and removal, all of a member's interest in an LLC included his voting and management rights. 2001 Committee Comment to 15 Pa. Cons. Stat. § 8924(a); <u>see</u> <u>also</u> Operating Agreement § 8.1. Thus, one conceivable view of the Operating Agreement would be that the estate of a member steps into that member's shoes until the full interests of membership are transferred, sold or resolved.

## 2. The Operating Agreement's Key Man Policy Provision for Buy Out of Membership

The parties additionally engage in vigorous dispute regarding the Operating Agreement's provision for a key man policy, which is not only relevant to the underlying substantive matter, but relates to whether Mr. Harris' full rights and interests of membership somehow were effectively extinguished or transferred back to the LLC as contemplated by § 11.3 prior to this

action being filed and removed.  In turn, that dispute directly relates to the determination of whether Abbott Acquisitions, LLC at the time of filing and removal only had one member and only Pennsylvania citizenship.

In their sur-reply, Defendants mischaracterize Plaintiff's arguments in support of remand as raising "a new smattering of factual allegations" in reply regarding the key man policy and the amount that would have been required under § 11.3 to complete the transfer of Mr. Harris' membership interest from his Estate prior to the filing and removal of this action. To the contrary, the Complaint clearly refers to the "key man" or $5,000,000.00 policy and the failures regarding same.  (ECF No. 1-1 at ¶¶ 9-10).  Defendants' argument that § 11.2 of the Operating Agreement makes no mention of an obligation to obtain "key man" or "$5,000,000.00" insurance, (ECF No. 19 at 4), is at best disingenuous assuming ignorance of what a key man policy is.  The terms of Operating Agreement § 11.2 expressly state an obligation to obtain insurance in an amount agreed to by the members; and the provision for that purchase combined with the provision in § 11.3 for the purchase of all of the member's interest for at least the value of that policy is the *very essence of* a key man policy—to provide insurance on the "key man," here each of the members of the LLC, and to then fund the buyout of the key man's interest in the company with the proceeds of the insurance upon his death.

A key man insurance policy is a common vehicle used by companies, corporations, and partnerships to provide funds for expenses occasioned on the death of the key man, such as a buy out of a partner or member's share in the entity.  See Black's Law Dictionary at p. 869 (6th ed. 1990) (defining "key man insurance" as a "[t]ype of insurance coverage purchased by companies to protect them on the death or disability of a valued employee or by partnership to provide for

funds with which to buy out the interest of such partner on his death or disability."); Rev. Rul. 2008-42, 2008-30 I.R.B. 175 (2008)("X purchases an employer-owned life insurance contract on the life of one of its employees in order to cover expenses the company would incur as a result of the death of the employee (also known as a key-man policy)."); see also Anthony v. Perose, 312 A.2d 360, 362 (Pa. 1973) (referring to the non-deductibility of premium payments made by an entity for a "key man insurance" policy insuring the life of an employee where the entity is a beneficiary); In re Estate of Cicchino, 2013 WL 11250756, at *3 (Pa. Super. 2013) ("The term 'COLI' is an acronym which refers to "corporate owned life insurance" policies purchased by a corporate employer covering the lives of its officers or employees. The corporate employer is the policyholder, premium payer, and beneficiary of a COLI policy. The concept of COLI has existed for many years to help insure against the loss of key employees and to fund executive deferred compensation, supplemental retirement, and other benefit plans. Common types of COLI policies . . . are known as "key man" policies, split dollar policies, and supplemental employee retirement policies ("SERP").")). Here, the policy expressly envisioned by the Operating Agreement involves insurance on each of the members of the LLC.  That the term "key man" is not used in the Operating Agreement, Complaint, or initial brief supporting remand, does not mean the policy envisioned by the Operating Agreement, encompassed in the allegations of the Complaint, or discussed in the Plaintiff's prior briefing is not what is commonly referred to as a "key man" policy, because it clearly is.  Cf. Baylson v. Disciplinary Bd. of Supreme Court of Pennsylvania, 975 F.2d 102, 111 (3d Cir. 1992) ("But as Shakespeare asked:  'What's in a name?  That which we call a rose [b]y any other name would smell as sweet.' . . . [I]t matters not at all what the [parties] choose to call it.")

In In re Estate of Cicchino, the court addressed similar considerations regarding a key man policy in the context of a partner's death, opining:

> Appellant's argument discounts that while Appellant was the surviving owner of the real estate, the partnership, and of Bella Salon, Inc., Appellant was not the sole owner of these entities by virtue of Decedent's death at the times the monies claimed were being transferred between the entities and expended. Stated another way, while the partnership dissolved at death, there was still a requirement for a *buyout* of the Decedent's partnership interest as set forth under Section 16 of the partnership agreement, in order for the Decedent's interest to be terminated. A buyout has not occurred.

2013 WL 11250756, at *6 (Pa. Super. Ct. Nov. 20, 2013). The court exercised its equitable powers to determine that the surviving partner could not both accept the proceeds of a key man policy, the purpose of which was a buyout, but then contend that the Estate was responsible for half of the business debts of the partnership on the decedent's death. Id. at *7 (internal citations omitted).  See also Brill Ventures, Inc. v. Equitable Variable Life Ins. Co., 1994 WL 675301, at *1 (E.D. Pa. Nov. 22, 1994) (involving "key man" policy insuring the life of employee).

The wire transfers by Abbott Furnace, Inc. into the widow's personal account may not necessarily have finished the deal.[11]  Viewed from Plaintiff's vantage point, the September 7, 2016 correspondence from Defendants' counsel and affidavit of Mr. Gaffney appears more opportunistic than business as usual or altruistic as the letter attempts to suggest.  Plaintiff contends that the fair market value of the Mr. Harris' member interests in Abbott Acquisitions Company, LLC, was somewhere between $6,000,000.00 and $8,000,000.00, (ECF No. 1-1 at ¶ 14), but the affidavit of Mr. Gaffney asserts that the value of Mr. Harris' interest in Abbott Acquisitions, LLC was $0 on his death under the formula provided for in Operating Agreement §

---

[11] At the very least, the $20,000.00 in transfers into what appears to be the widow's personal account, not authorized by the personal representative of the Estate and urged by Defendants as payment to the Estate care of Mrs. Harris under § 11.3, appears to be at the very least sharp gamesmanship towards Mr. Harris' widow.  The impact, characterization and propriety of these transfers ultimately will be left for consideration by the state court.

11.3.  Putting aside for the moment Plaintiff's assertion of breach of contract in the failure to purchase key man insurance in the same $5,000,000.00 amount agreed to and purchased on Mr. Gaffney's life, the Estate under Defendants' view of events could be left with no payment due and owing for Mr. Harris' membership interest, which may have resulted in an effective transfer or extinguishment of Mr. Harris' membership rights.  It may also be that no key man policy was purchased and maintained by Abbott Acquisitions, LLC on the life of Mr. Harris but one was purchased only on Mr. Gaffney in direct contravention of § 11.2 and duties under § 8.4, rendering the attempted transfer null and void.  The buyout or effective transfer of Mr. Harris' membership interest is central both to diversity jurisdiction and the merits of Plaintiff's action, presenting a complication in resolving the jurisdictional issue at this early stage in the litigation.

Quite evidently, based on the present record and foregoing analysis, the question of the citizenship of Abbott Acquisitions, LLC at the time of filing and removal is a uniquely thorny one.  Prior to Mr. Harris' death, Abbott Acquisitions, LLC clearly would have been considered both a citizen of Florida and Pennsylvania for purposes of diversity jurisdiction and complete diversity would not exist.  Considering the deemed sale provisions of the Operating Agreement on the death of a member, the potential impact of the prior effective LLC Act, and the disputes raised by Plaintiff forming the crux of the Complaint, the question whether Abbott Acquisitions, LLC retained Florida citizenship relates both to the threshold jurisdictional issue and the merits.

### 3.  Advisable route where jurisdictional facts are intertwined with the merits

Defendants argue that because the matter of the Court's subject matter jurisdiction is tied up with the merits, the Court should deny the motion to remand to the extent it is based on lack

of complete diversity and instead find that it has subject matter jurisdiction. (ECF No. 11 at 16). The Court agrees.

In an analogous context where a jurisdictional challenge was lodged as to federal question jurisdiction, the Third Circuit in <u>CNA v. United States</u> explained its approach to intertwined challenges:

> the proper course of action for the district court ... is to find that jurisdiction exists and to deal with the objection as a [an] attack on the merits. . . . This idea runs through numerous cases that classify issues as either jurisdictional or relating to the merits. . . . Our own approach to the meaning of "intertwined with the merits" . . . is best understood as referring to overlapping issues of proof. . . . [W]e have also recognized, where jurisdiction is intertwined with the merits of [a] claim, that a district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion. Rule 12(b)(1) does not provide [] the procedural safeguards of Rule 12(b)(6). . . . [W]e ensure that [parties] are not allowed to use Rule 12(b)(1) to resolve the merits too early in litigation. By requiring less of a factual showing than would be required to succeed at trial, district courts ensure that they do not prematurely grant Rule 12(b)(1) motions to dismiss claims in which jurisdiction is intertwined with the merits and could be established, along with the merits, given the benefit of discovery.

535 F.3d 132, 143–45 (3d Cir. 2008), <u>as amended</u> (Sept. 29, 2008) (internal citations and quotations omitted).

More recently, in <u>Davis v. Wells Fargo</u>, the Court of Appeals also cautioned:

> [w]e have already held that a district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion. Jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action. . . . [W]hen a factual challenge to jurisdiction attacks facts at the core of the merits of the underlying cause of action, the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case. We have repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits. Caution is necessary because the standards governing the two rules differ markedly, as Rule 12(b)(6) provides greater procedural

safeguards for plaintiffs than does Rule 12(b)(1). First, proceeding under Rule 12(b)(1) inverts the burden of persuasion. When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim. But under Rule 12(b)(1), the [proponent of jurisdiction] must prove the court has subject matter jurisdiction. *Id*. The two rules also treat the complaint's factual allegations very differently. . . . [I]mproper consideration of a merits question under Rule 12(b)(1) significantly raises both the factual and legal burden on [the parties].

824 F.3d 333, 348–49 (3d Cir. 2016) (internal citations and quotations omitted). <u>See also</u> <u>Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.</u>, 494 F.Supp. 1161, 1176-77 (E.D. Pa. 1980) (observing that the jury trials have been held on the issue of citizenship for diversity jurisdiction purposes as within the court's discretion when the jurisdictional and substantive issues are intertwined).

The Court comes to the inescapable conclusion that the issue of whether Abbott Acquisitions LLC had Florida citizenship at the time of filing and removal such that complete diversity was lacking is so intertwined with the merits that present resolution of that issue would be premature and improper. The Court thus follows the approach suggested by Defendants and sanctioned in <u>CNA</u>, <u>Davis</u>, and <u>Zenith</u>, and finds that it has diversity jurisdiction without presently resolving the substantive aspects of Plaintiff's claim. That approach does not necessarily save Defendants from remand of this matter because of the alternative basis asserted for remand by Plaintiff—the forum defendant rule, which the Court next addresses.

## B.     Forum Defendant Rule and Defect in Removal

Plaintiff made a timely motion to remand for the defect of the removal by a forum defendant. <u>See</u> <u>Green Tree Servicing LLC v. Cargille</u>, 662 F. App'x 118, 120 (3d Cir. 2016) ("[T]he District Court only has authority to remand based on a defect other than lack of subject matter jurisdiction when a timely motion is filed."). At the outset the Court notes the lack of appellate cases, generally, addressing the pre-service removal by forum defendants due to the

lack of reviewability on appeal of such remand orders.  Id. ("We have explained that § 1447(d) bars review of remand orders that are issued under § 1447(c) and invoke the grounds specified therein–a procedural defect or lack of jurisdiction.")(citing Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 126 (3d Cir. 1998)).

This Court is persuaded by decisions ordering remand on timely motion by a non-removing party where, such as here, a forum defendant removed the matter pre-service. "[R]emovability cannot rationally turn on the timing or sequence of service of process." Oxendine v. Merck and Co., Inc., 236 F.Supp.2d 517, 526 (D. Md. 2002).  "[G]iven that the purpose of the "properly joined and served" language is to prevent one form of gamesmanship—improper joinder—the court finds that allowing defendants to engage another type of gamesmanship—a hasty filing of a notice of removal—is demonstrably at odds with Congressional intent."  Sullivan v. Novartis Pharm. Corp., 575 F. Supp. 2d 640, 647 (D.N.J. 2008).  The forum defendant rule codified in § 1441(b) recognizes that the perceived problem of local bias that diversity jurisdiction seeks to address is inapplicable when the case is brought against a defendant who is a citizen of the forum state.  That rule bars removal to federal court by a forum defendant.  Swindell-Filaggi v. CSX Corp., 922 F. Supp. 2d 514, 518 (E.D. Pa. 2013).

The earlier version of the forum defendant rule created an opportunity for "procedural gamesmanship" by plaintiffs who could keep an action in state court simply by improperly joining a forum defendant or joining a forum defendant that plaintiff really never intended to serve in prosecuting the action.  The Supreme Court as early as 1890 recognized the problem with gamesmanship by plaintiffs, observing in Louisville & N.R. Co. v. Wangelin, 132 U.S. 599 (1890):

> [i]t is equally well settled that in any case the question whether there is a separable controversy which will warrant a removal is to be determined by the condition of the record in the state court at the time of the filing of the petition for removal, independently of the allegations in that petition, or in the affidavit of the petitioner, unless the petitioner both alleges and proves that the defendants were wrongfully made joint defendants for the purpose of preventing a removal into the federal court.

Id. at 601–02 (emphasis supplied). The Supreme Court in Chesapeake & O. R. Co. v. Cockrell, 232 U.S. 146 (1914), likewise observed:

> [a] civil case, at law or in equity, presenting a controversy between citizens of different states, and involving the requisite jurisdictional amount, is one which may be removed by the defendant, if not a resident of the state in which the case is brought; and this right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy.

Chesapeake, 232 U.S. 146, 152 (1914) (emphasis supplied).

As a result of a 1948 amendment designed to eliminate procedural gamesmanship on plaintiffs' side of the litigation, some present day forum defendants, perceiving an opportunity for "procedural gamesmanship" on the other side of the litigation, have rushed to the federal courthouse to file a notice of removal prior to service when they determine that an action has been filed against them in their home state court that otherwise might have been brought by the plaintiff directly in federal court under diversity jurisdiction but was not. See In re Avandia, 624 F. Supp. 2d at 409; Sullivan, 575 F. Supp. 2d at 645. To this end, Defendants contend that though they are forum defendants their pre-service removal of this action was appropriate under the "properly joined and served" language of § 1441(b) because they have not yet been served or have not been served properly. Defendants claim that their maneuver is fully sanctioned under the language of 1441(b), referring to what they call a *majority* view,[12] but what an ever growing

---

[12] The federal courts do not follow a "law of the district" or "majority rules" approach. Daubert v. NRA Group, LLC, 861 F.3d 382, 395 (3d Cir. 2017).

number of courts have termed improper "jack rabbit" or "snap removal" necessitating remand. See Little v. Wyndham Worldwide Operations, Inc., 2017 WL 1788427, at *5, --- F. Supp. 3d --- (M.D. Tenn. 2017) (remanding matter and commenting that in the view of many courts, permitting snap removal reaches an absurd result under the removal statute, collecting cases, and stating that the "sheer number of cases that disapprove of snap removals themselves make the propriety of removal in this case doubtful.").

In Sullivan v. Novartis Pharms. Corp., a district court thoroughly explained:

> [b]y 1948, it was clear that the troublesome issue of improper joinder [by plaintiffs] required a less muddled solution than merely examining a plaintiff's good faith in naming various forum defendants. Congress added the "properly joined and served" requirement in order to prevent a plaintiff from blocking removal by joining as a defendant a resident party against whom it does not intend to proceed, and whom it does not even serve. . . . Congress appears to have added the language only to prevent the then-concrete and pervasive problem of improper joinder. Indeed, it is inconceivable that Congress, in adding the "properly joined and served" language, intended to create an arbitrary means for a forum defendant to avoid the forum defendant rule simply by filing a notice of removal before the plaintiff is able to effect process. Defendants argue, unavailingly, that the addition of the language signaled an intention by Congress to narrow this exception to the statutory right of removal. There is nothing in the history of the removal doctrine, legislative or otherwise, which even suggests why Congress would have intended to limit the forum defendant rule. In fact, Congress has never deviated from the fundamental precept of the American court system that federal jurisdiction is very limited.

575 F. Supp. 2d 640, 645 (D.N.J. 2008) (internal citations and quotations omitted).

Similarly, the court in In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., opined:

> Courts have long analyzed the forum defendant rule in light of the main purpose of diversity jurisdiction—"to avoid prejudice to out-of-state defendants"—as well as the understanding that Congress intended § 1441(b) to restrict federal jurisdiction. . . . [T]he rule's "joined and served" requirement ensures that a plaintiff cannot thwart a foreign defendant's ability to remove the action simply by naming a forum defendant which the plaintiff has no intention of actually serving and pursuing in litigation. Notably, the rule is silent as to arguably equivalent defense tactics, in particular, the phenomenon—enabled by modern litigation technology—

of the forum defendant removing an action before being served with
process due to its ability to electronically monitor state court filings. . . .
Many courts, interpreting § 1441(b) literally, have permitted removal by a
not-yet-served forum defendant. Many other courts, emphasizing the
limited nature of federal jurisdiction, the purposes of diversity jurisdiction
and the restrictive nature of the removal statute, have held that the
"properly joined and served" requirement of § 1441(b) does not tacitly
permit removal by an un-served forum defendant, and have remanded
actions thus removed.

This Court, agreeing with the latter line of cases, rejects any construction
of § 1441(b) that would allow an in-state defendant to side-step the
restrictive purpose of the forum defendant rule by "racing to remove"
before being served with process. The core aim of diversity jurisdiction, to
permit out-of-state defendants an avenue of relief from prejudice in a
foreign state court, plainly is not implicated by a forum defendant's ability
to remove an action filed in its home state. The Court agrees with the
comprehensive analysis of the question by Senior District Judge
Debevoise of the District of New Jersey in *Sullivan v. Novartis,* in which
he concludes in part, after exhaustive research into the relevant case law,
language and history of § 1441(b), that any contention that removability
should depend on the timing of service is absurd on its face, and could not
have been intended by Congress.

In re Avandia, 624 F. Supp. 2d 396, 409–11 (E.D. Pa. 2009) (internal citations and quotations

omitted).

      According to Defendants, that Congress recently amended the statutes governing removal

in 2011 as part of the Federal Courts Jurisdiction and Venue Clarification Act of 2011 and did

not change the phrase "properly joined and served" necessarily means Congress intended this

defensive gamesmanship through this pre-service removal by forum defendants because

Congress would have been aware that some district courts had permitted pre-service removal by

forum defendants. (ECF No. 11 at 11). Defendants' arguments hold little sway. Another equal

possibility regarding Congressional failure to act readily presents. If Congress is presumed to

know of these district court opinions permitting their present gamesmanship, it likewise is

presumed to know of appellate court opinions, and more importantly, the Supreme Court's

acknowledgement of the longstanding principle that forum defendants cannot remove.  See Lincoln Property Co. v. Roche, 546 U.S. 81, 84 (2005); Johnson, 724 F.3d at 347.

As Williams v. Daiichi Sankyo, Inc., 13 F. Supp. 3d 426 (D.N.J. 2014), also points out Congress did not discuss pre-service removal at all in passing the 2011 amendments. The Williams court rejected the argument that amendments to § 1441(b) in 2011 confirm the propriety of removal by pre-service forum defendant, stating:

> § 1441(b) was revised by the Federal Courts Jurisdiction and Venue Clarification Act of 2011. Pub.L. No. 112–63, § 103(b), 125 Stat. 758, 760 (codified at 28 U.S.C. § 1441). In this revision of § 1441, Congress elected to leave the "properly joined and served" text of the forum defendant rule unchanged. *Id.* [Defendants] point out that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without a change." *Forest Grove School Dist. v. T.A.,* 557 U.S. 230, 239–40, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009) (quoting *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). Other district courts, in view of this presumption, give effect to the plain meaning of the forum defendant rule as being consistent with the 2011 drafters' intentions. *See, e.g., Munchel v. Wyeth LLC,* No. 12–cv–906–LPS, 2012 WL 4050072, at *4 (D.Del. Sept. 11, 2012); *Regal Stone Ltd. V. Longs Drug Stores Ca., L.L.C.,* 881 F.Supp.2d 1123, 1128–29 (N.D.Cal.2012). [Still] other courts reviewing the congressional record reach the opposite conclusion, finding that the legislative history of the Federal Courts Jurisdiction and Venue Clarification Act of 2011 does not mention the " 'properly joined and served' language … nor was the substantial disarray among the district courts discussed." *Gentile v. Biogen Idec, Inc.,* 934 F.Supp.2d 313, 320–21 (D.Mass.2013) (citing H.R.Rep. No. 112–10, at *11–16 (2011), *reprinted in* 2011 U.S.C.C.A.N. 576, 580). This Court finds the *Gentile* review of the 2011 drafters' intentions more persuasive. The *Gentile* court concluded that rejecting the plain language under similar factual circumstances to the instant case avoided "reward[ing] the kind of gamesmanship" that the "properly joined and served" language originally meant to avoid. *Gentile,* 934 F.Supp.2d at 321.

Id. at 431.  This Court agrees with the thorough analysis provided in Sullivan, In re Avandia, and Williams finding pre-service removal by forum defendants barred.

The pronouncements by the Supreme Court and Third Circuit further convince the Court that this matter must be remanded. In Roche, Justice Ruth Bader Ginsburg writing for the unanimous Court at the outset of the opinion quoted in full § 1441(b) and only one paragraph later in ruling stated that in no uncertain terms: "Defendants may remove an action on the basis of diversity of citizenship if there is complete diversity between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum State." 546 U.S. at 84 (emphasis added). This emphatic statement in Roche comports with the understanding of the very purpose of the forum defendant rule. See also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 352-353 (1999) (considering Congressional purpose and traditional understanding in interpreting section 1446(b) governing the procedure for removal added by Congress in 1949). The Court has no reason to doubt that the Supreme Court had both read and considered the single sentence of section (b) in directly quoting it and making its pronouncement. Likewise, the Court of Appeals for the Third Circuit in Johnson similarly stated: "a state court case that implicates diversity jurisdiction may generally be removed, provided that the defendant is not a citizen of the state in which the action is brought." Johnson, 724 F.3d at 346–47 (emphasis added) (internal citations and quotations omitted).

Finally, this Court observes that the "properly joined and served" language quite frankly is not so clear and plain as Defendants suggest. It truly is capable of differing meanings—e.g., a defendant that has been properly joined and served (Defendants' interpretation); a defendant that will be properly joined and served (a different interpretation consistent with Congressional intent to remedy a particular problem); or even a defendant that can be properly joined and served (same). Viewed in this vein, and considering: the purposes of diversity jurisdiction; the purpose of the forum defendant rule; the purpose for which Congress added the "properly joined and

31

served" language; that the removal statute is to be narrowly construed in favor of remand; the persuasive reasoning in <u>Sullivan</u> and <u>Williams</u>; and, most importantly, the statements by the United States Supreme Court in <u>Roche</u> and the Third Circuit in <u>Johnson</u> that the forum defendant cannot remove, this Court holds that this action was improperly removed by the forum Defendants, and it will grant Plaintiff's motion to remand.

**C.    Request for Cost and Fees**

Plaintiff requests costs and counsel fees be awarded pursuant to 28 U.S.C. § 1447(c) for improper and unreasonable removal.  (ECF No. 9 at 7).  As Plaintiff admits, "courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." <u>Martin v. Franklin Capital Corp.</u>, 546 U.S. 132, 141 (2005). Given that resolution of the diversity jurisdictional issue was favorable to Defendants and the existence of some authority sanctioning snap removal by a forum defendant, the Court cannot say that the removing party lacked an objectively reasonable basis for seeking removal, namely its reliance on the non-binding caselaw that this Court has declined to follow.  Accordingly, the Court will deny Plaintiff's request for costs and counsel fees**.**


**IV.    <u>Conclusion</u>**

In accordance with the foregoing, Plaintiff's motion for remand (Docket No. 8) will be granted and Plaintiff's request for costs and fees pursuant to 28 U.S.C. § 1447(c) will be denied.

An appropriate Order will follow.


<u>s/ Susan Paradise Baxter</u>
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: August 22, 2017